WILLIAM A. HOLDREN, Plaintiff, *v.* ORVAL C. MORRIS et al., Individually and as Copartners Doing Business under the Name of MORRIS & REIMANN, Defendants.

Supreme Court, Trial Term, Erie County, November 17, 1947.

*William J. Brock* and *Edward B. Horning* for plaintiff.

*Wallace H. Miller* for defendants.

VANDERMEULEN, J. A building known as 174 Court Street, Buffalo, New York, was being demolished by the defendants, Orval C. Morris and Nelson J. Reimann, members of a copartnership doing business under the firm name and style of Morris & Reimann. The defendants entered into an agreement with one Melvin Rupp whereby his equipment for breaking up concrete floors was rented out to defendants, together with the services of one of his employees, at a price of $2.75 per hour. The work was commenced in September, 1939. Because of

weather conditions the work ceased and was resumed in March, 1940.

On March 19, 1940, the plaintiff was sent by Mr. Rupp, along with the equipment, to this building that was being demolished. The plaintiff worked all morning, on the fourth floor breaking up the slabs of concrete with an air hammer. These slabs were about 15 feet long, 5 or 6 feet in width and 4 to 6 inches in thickness. They consisted of 3 blocks in each slab. About 59 blocks had been taken out in the morning prior to lunch time and after lunch time the plaintiff commenced work on the last slab. While working on it, the slab fell to the bottom of the building carrying the plaintiff with it, by reason whereof he was injured. He commenced this action to recover damages, claiming negligence on the part of the defendant partners.

The building was owned and used by the Atlantic & Pacific Tea Company as a bakery. It was four stories high. At the time the plaintiff commenced his work, the roof was off the building and the wall had been lowered to the extent that it was even with the top of the wall of the school that adjoined the premises. The first, second and third floors had been taken out so that there was nothing beneath the fourth floor except the debris that was lying in the basement.

I-beams eight or ten inches in width supported the concrete floors which were re-enforced with wire mesh, diamond-shaped, with six-inch holes in it. The concrete apparently was poured over and around the mesh in the course of the construction of the blocks.

This fourth floor was partly wooden and partly concrete. The concrete sections of the floor were located at the southwest corner of the building. At one time the concrete portion of the floor supported heavy steel cook ovens, known as cracker ovens. Steel re-enforcing rods and pipes ran across the building for re-enforcing the concrete. The reason for this re-enforcing was the heavy concrete wrapped around the steel construction. The tremendous weight of the ovens would have a tendency to bend the steel girders and they were anchored in concrete to protect them.

The procedure followed by the plaintiff for taking out the concrete slabs was as follows: The workmen breaking up the concrete would start at the west corner of the block and work toward the southerly side, then along the easterly side to the wooden floor on the north. Then a workman would snip the wire mesh with wire cutters, hit the block with a sledge hammer and it would fall into the cellar. By the same operation the adjoining block would be taken out next.

At the close of the plaintiff's case the defendants moved for a dismissal of the plaintiff's complaint, renewed the motion at the close of the entire case and moved for a direction of a verdict of no cause of action. Decision on all motions was reserved. After a lengthy deliberation the jury disagreed.

It was said in *Haefeli* v. *Woodrich Engineering Co.* (255 N. Y. 442, 448): " An occupant of land owes to the servants of an independent contractor, employed to do work thereon, the duty of exercising ordinary care to render the premises reasonably safe for the performance of the work." (*Sommer* v. *Public Service Corporation*, 79 N. J. L. 349; *Richards* v. *Consolidated Lighting Co.*, 90 Vt. 552; *Spry Lumber Co.* v. *Duggan*, 182 Ill. 218; *Crimmins* v. *Booth*, 202 Mass. 17; *Pauckner* v. *Wakem*, 231 Ill. 276; *Hupfer* v. *National Distilling Co.*, 114 Wis. 279; *Galvin* v. *Mayor of New York*, 112 N. Y. 223; *Quinn* v. *Staten Island R. T. Ry. Co.*, 224 N. Y. 493.)

In *Caspersen* v. *La Sala Bros.* (253 N. Y. 491, 494) the court said: " We think the owner of the building, acting as general contractor, was under a duty to the plaintiff to use reasonable care in maintaining the approaches to the elevator in a condition of reasonable safety, and is answerable in damages if the duty was ignored. Liability is not defeated by the fact that the plaintiff was a servant of a subcontractor, and not a servant of the owner. He had come into the building in furtherance of the owner's business, and was using ways and approaches necessary or suitable to enable him to go forward with his work. In such circumstances the duty of protection is independent of the relation of servant and employer. This was so at common law. (*Coughtry* v. *Globe Woolen Co.*, 56 N. Y. 124.) It is so to-day under the statute (Employers' Liability Law [Laws of 1921, ch. 121], § 2; Cons. Laws, ch. 74; Labor Law, § 200; Cons. Laws, ch. 31; *Hess* v. *Bernheimer & Schwartz Brewing Co.*, 219 N. Y. 415, 418)." (See, also, *Brennan* v. *M. L. P. Builders Corp.*, 262 N. Y. 464, and the recent case of *Richling* v. *Rockwood & Co.*, 296 N. Y. 858.)

A case clearly setting forth the above rule is *E. J. O'Brien & Co.* v. *Shelton's Administrator* (246 Ky. 537). There the defendant employed the plaintiff's intestate to assist in the wrecking of a tobacco warehouse. The defendant ordered the intestate to climb up the framing on the inside of the building and knock off the iron sheeting with a crowbar. While sitting astride a brace in the performance of this work, the brace gave way. Several witnesses testified (p. 540) that " the proper, usual, and customary method of tearing down a building, such

as the one here involved, is to erect scaffolding to enable the workmen to perform the work with greater safety.'' The court said (p. 541): '' While the master cannot be held liable for failing to furnish a safe place, when the place itself is being demolished or repaired, yet if he adopts a method for doing the work which is hazardous when a safer method is available and the employee is injured by reason of the master's failure to adopt a safer method, the master is liable. It is his duty to adopt a reasonably safe method of doing the work, although the work is essentially of a hazardous nature.''

In the case of *Chinn* v. *Ferro-Concrete Construction Co.* (148 App. Div. 368, affd. 210 N. Y. 634) the question of the method the defendant employed in constructing the building was submitted to the jury.

The case of *Thomas* v. *Solvay Process Co.* (216 N. Y. 265) is somewhat similar to the instant case insofar as the position of the higher court on the question of submission of the case to the jury is concerned.

In the instant case, the owner of the premises had entrusted to the defendants the job of tearing down the building on the premises. From that point on the occupancy and temporarily the possession of the premises for the purpose of demolishing the building was the defendants. The manner and method in which the building was to be torn down was the obligation of the defendants. This placed upon the defendants the duty of rendering the premises reasonably safe for the performance of the work of demolishing and this involved a reasonably safe method of demolishing the building insofar as persons performing the work were concerned. The jury might have found that the method of commencing the demolition of the lower floors first, leaving the top floor the last one on which the concrete blocks were to be taken out, weakened the support of the fourth floor. One witness for the plaintiff, who claimed to have been in the business of wrecking buildings for forty-five years, said that in the process of demolishing buildings the custom was to have a floor under the workmen all the time. In the demolition of the building in question there was not a floor under the one on which the man was working. The jury might have found that the method used by the defendants required protective measures below the fourth floor in the event of an accident of this kind happening. The jury might have found that the taking of fifty-nine blocks out of a top floor could have caused a spread of the I-beams, causing the block to drop prematurely, and that this should have been anticipated

by the defendants who were experienced wreckers and that suitable protective measures should have been provided.

It appears to me that the defendants in the instant case owed the same duty to the plaintiff that they would to a business visitor, in that they were bound not to demolish the building so as to create a situation that would cause injury to their own and other employees.

I am of the opinion that the case was properly submitted to the jury.

The motions to dismiss the complaint and for a direction of a verdict in favor of the defendants are hereby denied.